CROCKER–WHEELER CO. v. BULLOCK.

(Circuit Court, S. D. Ohio, W. D.   December 28, 1904.)

1. DEPOSITIONS DE BENE ESSE—FEDERAL STATUTE—AUTHORITY OF CLERK TO ISSUE SUBPŒNA DUCES TECUM.

   A clerk of a Circuit Court has authority, when so directed by an order of the court, to issue a subpœna duces tecum to require the production of documents on the taking of depositions de bene esse before him, pursuant to Rev. St. § 863 [U. S. Comp. St. 1901, p. 661].

2. SAME—CLAIM OF PRIVILEGE BY WITNESS—JURISDICTION TO DETERMINE.

   On the taking of a deposition de bene esse in another federal district under Rev. St. § 863 [U. S. Comp. St. 1901, p. 661], the witness may assert his legal privilege to refuse to give testimony or to produce documents called for the same as though examined in open court, and in such case he has a right to be heard before the court in such district, and to have his claim of privilege determined by such court, before being compelled to answer or produce the documents.

3. WITNESS—PRIVILEGE—DISCLOSURE OF TRADE SECRETS.

   A witness has a legal privilege to refuse to give testimony sought, or to produce documents called for, where such testimony or documents will disclose trade secrets, and where the evidence is irrelevant or otherwise inadmissible in the case.

   [Ed. Note.—Disclosure of trade secrets, see note to S. Jarvis Adams Co. v. Knapp, 58 C. C. A. 8.]

4. SAME—RELEVANCY OF DOCUMENTS CALLED FOR.·

   The issues in an action by a corporation against an individual to recover damages for breach of a contract by which the defendant agreed to sell to plaintiff the stock of another corporation of which he was president discussed, and held not such as to render the books of the latter corporation relevant or admissible in evidence, so as to entitle the plaintiff to compel the officer having them in charge to produce the same on the taking of his deposition in another federal district, in compliance with a subpœna duces tecum, against his claim .of privilege, it being further shown that the two corporations were competitors in business, and that the disclosures would be detrimental to the corporation of which the witness was an officer.

5. SAME.

   The fact that the defendant in such action at the time of the making of the contract was the owner of all the stock of the corporation which he undertook to sell could not enlarge the rights of the plaintiff as against the claim of privilege of the officer of such corporation, whom plaintiff had made a witness.

On application for attachment against a witness for refusal to produce books in compliance with a subpœna duces tecum on the taking of his deposition.

Noble, Jackson & Hubbard, Augustine D. Humes, and Harmon, Colston, Goldsmith & Hoadly, for applicant.

Morrison R. Waite, for witness.

COCHRAN, District Judge.   This is a proceeding in an action pending in the Circuit Court of the United States for the district of New Jersey.   The action is at law, and was brought by the Crocker-Wheeler Company against George Bullock to recover damages for breach of contract made April 27, 1900, by and between S. S. Wheeler, then president of said Crocker-Wheeler Company, and said George Bullock, the

134 F.—16

president of the Bullock Electric Manufacturing Company, whereby said Bullock agreed to sell to said Crocker-Wheeler Company all the outstanding stock of said Bullock Electric Manufacturing Company in exchange for stock of the former company. The proceeding in this court in said action is an application by the plaintiff therein, said Crocker-Wheeler Company, for an attachment against Joseph S. Neave, a resident of this district, and vice president of said Bullock Electric Manufacturing Company, for contempt in refusing to produce the journals, ledgers, cash, sales, and invoice books, and all other books of account of said company for the years 1899, 1900, 1901, 1902, 1903, and 1904, before the clerk of this court in obedience to a subpœna duces tecum commanding him to do so, issued by said clerk pursuant to an order thereof made after notice to said defendant Bullock. The refusal to produce was upon advice of counsel, and the witness, through said counsel, resists and objects to the granting of said application. It is urged upon his behalf, in the first place, that the clerk, though directed by this court to do so, was without authority to issue the subpœna. It is not claimed by the plaintiff that he had any authority to issue it, save so far as it was conferred by section 863 of the Revised Statutes [U. S. Comp. St. 1901, p. 661]. This position of the witness therefore amounts to a denial that said section conferred such authority upon the clerk. He contends that a subpœna duces tecum for the production of documents out of court in an action at law can only be obtained under sections 866–869, inclusive [U. S. Comp. St. 1901, pp. 663–665]. I do not find it necessary to consider this contention on its merits. It has been so considered by able federal judges; and, so far as their reported decisions go, they have invariably held that a subpœna duces tecum for such purposes can be obtained under section 863. It has been so held by Judges Choate, Jenkins, Lowell, and Colt in the following cases, to wit: U. S. v. Tilden, Fed. Cas. No. 16,522; Lowrey v. Kusworm (C. C.) 66 Fed. 539; Davis v. Davis (C. C.) 90 Fed. 791; Dancel v. Goodyear Shoe Mfg. Co. (C. C.) 128 Fed. 753. In the case of Ex parte Peck, 3 Blatchf. 113, Fed. Cas. No. 10,885, Judge Betts expressed a doubt as to whether said section authorized a subpœna duces tecum, but this all the farther that any federal judge has gone in the direction of holding that it did not. Counsel for witness claims that Judge Adams, in the case of Stevens v. M. K. & T. Ry. Co. (C. C.) 104 Fed. 934, "squarely" decided in accordance with his contention. But I do not so read that decision. Two things were decided therein. One was that in an equity suit a deposition cannot be taken under said action before the cause is at issue. The other was that the clerk of a circuit court cannot issue an ordinary subpœna under that section commanding a witness to appear and testify before a notary public, one of the officers authorized to take depositions thereunder. Why he so held does not appear. It is certainly not because he thought that an ordinary subpœna cannot be obtained under said section. It could only have been because he thought either that the subpœna in such a case should have been issued by the notary himself or pursuant to a direction of the court. I can conceive of no other reason. The likelihood is that it was for the latter reason. In the case of Dancel v. Goodyear Shoe Mfg. Co. (C. C.) 128 Fed. 753. Judge Colt held that the clerk had no au-

thority to issue a subpœna duces tecum under section 863 without an order from the court for him to do so. In the case, however, of Henning v. Boyle (C. C.) 112 Fed. 397, Judge Lacombe held that the clerk had authority to issue an ordinary subpœna to testify without such previous order. But the holding of Judge Adams in the Stevens Case can have no application here, because the subpœna duces tecum in question commanded the appearance of the witness and production of said books before the clerk himself, who is authorized to take depositions under said section, and was issued pursuant to the direction of this court after notice to the defendant.

In view, then, of this state of the decision, I hold that this position of the witness is not well taken. Besides, the allowance of the subpœna by Judge Thompson must be treated as a holding by him that said statute authorized its issuance; and, even if I had any doubt on the subject —which I have not—comity requires that I follow him.

All else that is urged on behalf of the witness against the application for an attachment may be reduced to a single contention, and that is that the witness has a legal privilege to withhold the books called for. It is not thus directly put, but that is what it amounts to. It is only in the assertion of a legal privilege to withhold that a witness can refuse to testify or produce documents in obedience to a subpœna regularly issued, or be heard upon an application for contempt in so refusing. Counsel for plaintiff seemingly ignore this question of privilege, and treat the matter as if the only parties interested in the disposition of this application were the parties to the action. It is in this view that they urge that this court, in acting thereon, does so simply in aid of the trial court, and should compel the production of the books called for if it is possible under any circumstances, that they may be admissible in evidence, and thus as it were pass the question of their admissibility on to the trial court for its determination. Of course, if this view were correct, such a subordinate attitude on the part of this court might be proper; for, as stated by counsel, if the books were inadmissible in evidence, they could be excluded by the trial court, whereas, if they were admissible, and this court were not to compel their production, there would be no way to get them in evidence. But upon the idea that the witness has an interest in the disposition of the application, and his resistance thereto is in the assertion of a legal privilege to withhold, this court cannot occupy such attitude toward the application, but should dispose thereof as if it were the trial court and the question arose in the course of the proceedings before it; for otherwise the privilege would be denied without hearing, or treated as if it were a light matter, when it is of equal dignity with the right asserted by plaintiff in the action. And so it was held in the case of In re Judson, Fed. Cas. No. 7,563, involving a proceeding similar to this. Judge Betts there said:

"The counsel for the motion urges that it belongs to the court in Massachusetts, on the return of the deposition, to determine whether the evidence is pertinent to the case, and that the court will exclude the evidence if it is found not to be pertinent. This argument is correct in so far as it relates to the conduct of the commissioner. That officer must write down and return to the court any species of evidence offered before him, and the court will

receive or reject it, according to the rights of the parties. But most serious mischief may be in that way effected if a witness is compellable in all cases to answer, in the first instance, all questions put to him. He may be compelled to make public important secrets in relation to the rights or character of himself or others, which the party extorting them has no title to or interest in, and which are drawn out through a course of interrogation that would have been pre-emptorily arrested had the examination taken place in open court. These ex parte examinations cannot claim privileges or powers which the court they are designed to aid could never exercise itself. This court imposes its authority to attend before commissioners and give evidence there under the provisions of the thirtieth section of the judiciary act of 1789 [Act Sept. 24, 1789, c. 20, 1 Stat. 88], which declares that any person may be compelled to appear and depose before a commissioner in the same manner as to appear and testify in court. Accordingly, a refractory or reluctant witness who has been duly subpoenaed to attend for examination before a commissioner will be made to obey the order to the same extent as if the writ of subpoena had been returnable to this court. There is nothing in the law or the reason of the case which supplies a different authority in respect to ex parte evidence taken out of court from that which legally appertains to the court in proceedings before it. The act places both on the same footing."

The thirtieth section of the judiciary act of 1799 referred to was subsequently embodied in section 863. In the case of In re Allis (C. C.) 44 Fed. 216, which was a proceeding to compel the production of documents by a witness whose deposition was being taken under equity rule 67 in a district foreign to that where a suit in equity was pending, Judge Jenkins said:

"It is insisted that the rule contemplates that all questions must be referred as to their relevance to the court having jurisdiction of the cause. Undoubtedly that court has the ultimate control of a decision upon the materiality of the examination. But it is quite another matter with respect to the compulsion of a witness to answer. In such case the court or judge must be satisfied of the contumacy of the witness. The witness responds to the authority dominant at his residence. He is beyond the coercive power of the court entertaining the cause. His disobedience is to the mandate of the court issuing the writ of subpoena, not the court issuing the commission. The question of disobedience involves both the materiality of the interrogatories and the privilege of the witness, and both must be considered by the court exercising jurisdiction of the witness; and this for the protection of the witness as well as for the proper conduct of the examination."

Of course, if the existence of the privilege depends upon or is affected by any question in the action which has been heretofore determined by the trial court, comity might require that its determination thereof be accepted as correct.

Has, then, the witness a legal privilege to withhold the books called for in the subpoena? The privilege asserted is not to withhold testimony, but to withhold documents. It seems to be settled that ordinarily, at least, no witness has a legal privilege to withhold testimony simply because it is irrelevant or otherwise inadmissible in evidence. The party against whom such testimony is offered can alone make such objection to its introduction. Wigmore on Evidence, vol. 3, § 2210, says:

"The witness has no privilege to refuse to disclose matter irrelevant to the issue in hand—First, because irrelevancy is a concern of the parties alone, and may be obviated as a ground for exclusion by their consent or failure to object; and, secondly, because there is in the mere circumstance of irrelevancy nothing which creates for the witness a detriment or inconvenience such as should suffice to override his general duty to disclose what the court requires.

However, the recognition of a privilege of this sort would add innumerable opportunities to make a claim of privilege, and would thus tend to complicate the trial, and add to the uncertainty of the event."

Gamble, J., in Ex parte McKee, 18 Mo. 599, said:

"The objection to the relevancy or competency of evidence is for the parties litigant to make, and not for the witness."

But it is possible that the witness has a legal privilege to withhold documents called for simply because they are irrelevant or otherwise inadmissible. And it would seem probable that he has such privilege to withhold either—i. e., testimony or documents—if the introduction of it or them would be prejudicial to him, and it or they are irrelevant or otherwise inadmissible in evidence. As to discovery from a defendant, Lord Chancellor Hatherly, in the case of Moore v. Craven, 7 Ch. App. 94, said:

"The court does not, when discovery is a matter of indifference to the defendant, weigh in golden scales the questions of materiality or immateriality; but when the nature of 'the discovery required is such that the giving of it may be prejudicial to the defendant the court takes into consideration the special circumstances of the case, and whilst, on the one hand, it takes care that the plaintiff obtains all the discovery that can be of use to him, on the other it is bound to protect the defendant against undue inquisition into his affairs. The question of materiality must be tested by reference to the cause made by the plaintiff's pleadings and to what will be in issue at the hearing."

But, however it may be as to these two quotations, there can be no question but that, if the giving of the testimony sought or the production of the documents called for will disclose what are characterized as "trade secrets," the witness has a legal privilege to withhold if it or they are irrelevant or otherwise inadmissible in evidence. Wigmore on Evidence, vol. 3, § 2212, says:

"In a day of prolific industrial invention and free economic competitions it may be of extraordinary consequence to the master of an industry that his process be kept unknown from his competitors, and that the duty of a witness be not allowed to become by indirection the means of ruining an honest and profitable enterprise. This rule, and the necessity of guarding against it, may extend not merely to the chemical and physical composition of substances employed and to the mechanical structure of tools and machines, but also to such other facts of possibly private nature, as the names of customers, the subjects and amounts of expenses, and the like. Accordingly there ought to be, and there is, in some degree, a recognition of the privilege not to disclose that class of facts which, for lack of a better term, have come to be known as 'trade secrets.'"

And further on in the same section it is said:

"What the state of the law actually is would be difficult to disclose precisely. It is clear that no absolute privilege for trade secrets is recognized. On the other hand, courts are apt not to require disclosure except in such cases and to such extent as may appear to be indispensable for the ascertainment of truth. More than this in definition can as yet hardly be ventured."

The only serious question here is whether disclosure of trade secrets should be enforced if they are relevant and admissible in evidence. The last quotation from Wigmore indicates that in his opinion it should be, provided they are indispensable for the "ascertainment of truth." This

is further indicated by this statement in the same section between the two quotations made therefrom, to wit:

"No privilege of secrecy should be recognized if the right of possibly innocent persons depends essentially or chiefly upon the disclosure in question."

None of the decisions relied on by counsel for plaintiff hold that the giving of testimony or the production of documents will be enforced when such action will cause the disclosure of trade secrets, if it or they are irrelevant or otherwise inadmissible in evidence. In the case of Wertheim v. Continental R. & Trust Co. (C. C.) 15 Fed. 717, it was held that the officer of a corporation not a party to the suit should be compelled by a subpœna duces tecum and process of contempt therein to produce certain books and papers. But it was only claimed that the production of the books and papers would inconvenience the corporation, and it seems to have been conceded that they were necessary and vital to the rights of the litigants. Judge Wallace said:

"Considerations of inconvenience must give way to the paramount rights of litigants to resort to evidence which it may be in the power of witness to produce, and without which grave interests might be jeopardized, and the administration of justice thwarted."

In the case of Robinson v. Philadelphia & R. R. Co. (C. C.) 28 Fed. 340, in referring to applications such as that involved herein, Judge Butler said, as quoted by counsel for plaintiff, that:

"The court generally inclines towards the application, and requires an answer wherever it seems probable the testimony may be relevant."

But there the privilege asserted was to withhold testimony, not documents, and the privilege was upheld because the testimony was irrelevant, and its giving would have been prejudicial to the witness. Judge Butler added to the foregoing quotation these words:

"Care, however, must be exercised to avoid unnecessary and improper inquiry into private affairs."

The favoring attitude expressed in the quotation relied on therefore could only have had reference to testimony that is a "matter of indifference," the materiality or immateriality of which, as expressed by Lord Hatherly, the court will not "weigh in golden scales." In the case of Johnson Steel S. R. Co. v. North Branch S. Co. (C. C.) 48 Fed. 195, Judge Reed went further than was gone in either of the two foregoing cases, and held that the production of certain drawings should be enforced, notwithstanding their production would be prejudicial to the company of which the witness was an officer. But no question was made as to the relevance and materiality of the drawings to the controversy involved in that case. This is in accord with the position of Prof. Wigmore. The authorities relied on by counsel for witness, to wit, In re Pacific Ry. Com. (C. C.) 32 Fed. 241, 250; Henry v. Insurance Co. (C. C.) 35 Fed. 15; Southern Ry. Co. v. North Carolina Com. (C. C.) 104 Fed. 700; In re Horgan (D. C.) 97 Fed. 319—are possibly against such an advanced position. It should be accepted, therefore, as correct law, that a witness should not be compelled to disclose trade secrets embedded in his head or in documents in his possession, when

their disclosure will be prejudicial to him or his company, and they are not relevant to the controversy in the suit or action in which he is a witness, or otherwise admissible in evidence therein.

Thus far the consideration of the matter in hand has had no special reference to a proceeding under section 863, as this is. Limiting it thereto, we find that it has never been held that the giving of testimony, subject only to the complaint that it was irrelevant or otherwise inadmissible in evidence, should be enforced by process of contempt. And it has been held that the production of documents should never be so enforced in proceedings thereunder unless they were relevant.

In the case of Ex parte Peck, supra, Judge Betts said:

"It must also be shown that the witness was called to testify to facts material and relevant to the issue in the case. The court will interfere in this summary way only to aid the plain demands of justice, and will not attach a witness for neglecting to testify without evidence that his testimony is pertinent to the cause, and such as the party is entitled by law to demand. In this case the object seems to be to obtain access to papers in the possession of the witness to be used in the case."

In the case of In re Judson, supra, the same learned judge said:

"I see no reason why any more stringent obligation should be imposed upon a witness in these outside examinations than is enforced in court. Before the court will adjudge a witness to be in contempt, or commit him therefor, it will require more than proof that he declines to respond to a question. It will inquire whether the question is relevant and material to the case or hearing, and also whether the witness is legally exempt from answering it. No contumacy can be imputed to him until these points are determined. The law gives no color to the practice which not infrequently intrudes upon judicial proceedings, of besetting a witness with impertinent inquiries calculated to pry into his private affairs or into his own character or that of other persons, or to subject him to personal liability, when the inquiries are not shown to have a legitimate bearing upon the cause on trial; and it is guarded in coercing answers to questions when their materiality is not clearly manifest."

In the case of Dancel v. Goodyear Shoe Mfg. Co., supra, which was an application in the United States Circuit Court for the District of Massachusetts for an order directing the clerk to issue a subpœna duces tecum under section 863 in an action pending in the United States Circuit Court of the District of New York, S. D., Judge Colt, said:

"A party undoubtedly has the right to invoke the process of the court to compel the attendance of witness and the production of such papers as are material to his case; but neither the right of a party nor the power of the court extends beyond this. A party has no right, and the court has no power, to compel the production, either in court or before a magistrate, of the private papers of a witness which are not relevant and material to the case. Any practice which sanctions such a proceeding is unwarranted, and an infringement upon a fundamental personal right guarantied by the federal Constitution. The courts have always recognized this protection to the individual, secured by our organic law. Such recognition is seen in the distinction which is made between a subpœna ad testificandum and a subpœna duces tecum. The former is a process of right, while the latter is addressed to the discretion of the court. Discretion here does not mean that the court has power to refuse the compulsory production of a paper which is material evidence in the case, but that, before compelling its production by a subpœna duces tecum, it will sufficiently inquire into the matter to determine if the evidence appears to be material, and, if not satisfied on this point, will decline to issue a writ."

The application was denied, notwithstanding it was stated therein that the documents called for were "material and necessary," because it did not appear prima facie that such was the case.

With this presentation of the law as to the privilege of a witness to withhold documents called for in a subpœna duces tecum, we are prepared to take up and dispose of the privilege asserted here.

The Crocker-Wheeler Company and the Bullock Electric Manufacturing Company were New Jersey corporations engaged in the business of making and selling electrical apparatus. They were therefore rivals in business. The works of the former were located in New Jersey, and those of the latter in Ohio, near Cincinnati. The books called for, if produced in evidence, will disclose to the Crocker-Wheeler Company, and any other having an opportunity to inspect them, certain of the trade secrets of the Bullock Company, to wit, at least, who are its customers, what are its methods of doing business, and what are its expenses of operating; and such disclosure cannot but be prejudicial to that company. If, then, said books are not relevant to the controversy between the Crocker-Wheeler Company and George Bullock in the action pending in the Circuit Court of the United States for the District of New Jersey, there exists the strongest possible case for the witness having a legal privilege to withhold them. In order to determine whether they are relevant thereto, it is necessary to understand what are the issues in that action. To enlighten the court on this subject, copies of the pleadings therein and of the opinion of Judge Gray delivered upon overruling demurrer to the declaration have been filed. From the declaration it appears that said action is, as heretofore stated, one to recover damages for a breach of the contract heretofore referred to. That contract did not provide how much stock of the Crocker-Wheeler Company Bullock was to receive in exchange for the stock of the Bullock Company. It therefore did not fix the price that Bullock was to get therefor. If this had been all the contract contained on the subject of price, it would have been an incomplete contract, and void for uncertainty; for the price at which property is sold is an essential term in the contract of sale thereof. Mechem on Sales, vol. 1, §§ 204, 205, says:

"A distinguishing feature of a sale, as has been seen, is that it is a transfer of the absolute title to a thing for a price in money or its equivalent. There can therefore be no valid sale unless the price has been determined upon by the parties themselves, either expressly or impliedly, or unless some means or method be agreed upon by the parties or established by law by which the price may be determined. Hence, in the case of executory contracts, where parties are negotiating in respect of a sale and of the price to be paid thereon, the contract of sale cannot be deemed to be completed so long as the price remains undetermined. There will therefore be no sale if the parties, though apparently agreed, are really mutually mistaken as to the price to be paid. There will also be no sale if the price is left to be afterwards agreed upon, and the parties fail afterwards to agree; though, if the sale be for a reasonable price to be afterwards agreed upon, and the parties cannot agree, the law will supply the method."

In the recent case of United Press v. New York Press Co., 164 N. Y. 406, 58 N. E. 527, 53 L. R. A. 288, it was held that a contract to take

press reports for a term of years at not more than $300 per week, without making any other provision as to price, is too indefinite to permit a recovery of anything more than nominal damages for its breach.

The contract, however, did provide a mode of determining how much stock of the Crocker-Wheeler Company Bullock was to get in exchange for the stock of the Bullock Company. It provided several alternative methods of determining the value of the stock of both companies, one of which did not contemplate any further agreement by the parties, and another of which called for a valuation by an appraiser to be agreed on subsequently by both of them, and that Bullock should receive as many shares of stock of the Crocker-Wheeler Company, thus valued, as equaled in value the stock of the Bullock Company, thus valued. This provision made the contract potentially certain; as much so as if the number of shares of stock that Bullock was to receive had been named in the contract; for in the eye of the law that is certain which can be made certain. Mechem on Sales, vol. 1, p. 212, says:

"It is also competent for the parties to provide that the price shall be such as may thereafter be fixed by valuers, and in case it is so fixed they are as much bound by it as if they had fixed it themselves."

The contract further provided that each party thereto should assist said appraiser in making a valuation of the stock of their respective companies by providing him with a certain statement, and permitting him to have free access to their properties and books. It was alleged in the declaration that said parties had, subsequent to the making of the contract, agreed on an appraiser; that the Crocker-Wheeler Company had rendered the stipulated assistance to the appraiser to enable him to make a valuation of its stock; that Bullock had failed and refused to furnish such assistance; and that because of such failure and refusal no valuation was made of either of said stocks by said appraiser. It follows from this that said contract has never been made complete and certain in the particular in which it was incomplete and uncertain when executed, and that it remains as incomplete and uncertain as it was at that time. What then, if any, are the rights of the Crocker-Wheeler Company against said Bullock under said contract? If the latter had not prevented the making of the valuation by the failing and refusing to assist the appraiser, no one would contend that the Crocker-Wheeler Company had a right of action against him on the contract.

Mechem on Sales, vol. 1, § 213, says:

"But in order that the contract shall take effect it is essential that the price shall be fixed as provided in the agreement, for, if the parties fail to appoint valuers, or the latter fail or refuse to act, the contract, if executory, must fail."

Benjamin on Sales (6th Ed.) § 87, says:

"It is not uncommon for the parties to agree that the price of the goods sold shall be fixed by valuers appointed by them. In such cases they are, of course, bound by their bargain, and the price, when so fixed, is as much part of the contract as if fixed by themselves. But it is essential to the formation of the contract that the price shall be fixed in accordance with their agreement; and, if the persons appointed as valuers fail or refuse to act, there is no contract in the case of an executory agreement."

Burdick on Sales, p. 89, says:

"Until the agreed person names the price, no obligation attaches to either seller or buyer; and the latter has no interest in the goods which may have been set apart by the seller for him, nor has he a right of action arising out of the contract."

Slight reflection will show that in the very nature of things this could not be otherwise. A court of equity will not specifically enforce a contract of sale against the seller where specific performance is a proper remedy without providing that he gets his price. But where the price is to be fixed by a valuer, the seller's price is not a price fixed by any good man, or any other price than that fixed by the named valuer. Hence, until he has fixed the price, no provision can be made for the seller getting his price, and the contract cannot be specifically enforced against him. Again, a court of law will not adjudge a seller liable in damages on a contract of sale unless the buyer is at least able, ready, and willing to give him his price, and will only, as a general rule, at least, make him liable for the difference between such price and the market price, if there is one, or, if not, the actual value thereof. But his price, where it is to be fixed by a valuer, is not a price fixed by 12 good men, or any other price than that fixed by the valuer. Hence, until the price is so fixed, the seller cannot be liable at law.

What, then, was the effect of the circumstance that Bullock prevented the valuation by the agreed appraiser in the manner charged? Was it to give the Crocker-Wheeler Company a right of action against him on so much of the contract as related to the agreement to sell? It is not entirely clear that Judge Gray was not of the opinion that it did, and thought that possibly a valuation could be had by 12 good men, to wit, a jury, in substitution for that of the agreed appraiser, in order to fix the Crocker-Wheeler Co.'s rights on said portion of the contract. But, to say the least, such a position is open to question. Mr. Benjamin concludes the quotation from his work heretofore made with the statement that, if the valuers "fail or refuse to act, there is no contract in the case of an executory agreement," and adds thereto these words, "even though one of the parties should himself be the cause of preventing the valuation." And such would seem to be the necessary implication from the decision of Sir George Jessel in the case of Smith v. Peter, L. P. 30 Eq. 511, referred to by Judge Gray. That was a suit for specific performance of a contract for the sale of a house and the fixtures and furniture at a price to be fixed by a person named therein. The person named undertook the valuation, but was refused permission by the vendor to enter the premises for that purpose. Specific performance was enforced, but not without a price being fixed, nor upon a price fixed by a good man named by the court. It was enforced upon a price fixed by the person who was named in the contract. The vendor was compelled to permit him to fix the price, and, upon its being so fixed, he was compelled to accept it and convey the property.

The general principle that, where performance by plaintiff of his part of the contract is a condition precedent to performance by defendant of his part, and had been prevented by defendant, the nonperformance thereof is excused, and a right of action accrues to plaintiff without

performance, can hardly have application to a case like the one under consideration, and determine the rights of the parties. That principle finds room for application in the case of complete contracts—contracts complete at the start, or subsequently made so. Where the contract was not complete at the start, and has never been made so since, the valuation by the appraiser was not the performance of a condition precedent in a complete contract. It was the fixing of a term in an incomplete contract, the making of an incomplete contract complete, without which there was no valid subsisting contract so far as the agreement to sell was concerned. But, though the Crocker-Wheeler Company may not have a right of action on so much of the contract as relates to Bullock's agreement to sell because of his preventing the valuation, it does not follow that it did not have a right of action against him on the contract. It seems to me that in every contract to sell property for a price to be fixed by an appraiser it should be held that it is an implied term of the contract that neither party is to do anything to prevent the fixing of the price by him. But, however this may be, the contract involved herein expressly provided that each party should assist the appraiser agreed upon by them in making the valuation of their respective stocks by furnishing to him a certain statement and permitting him free access to their respective properties and books. Bullock therefore agreed not only to sell said stock at the valuation fixed by said appraiser, but also to so assist in the valuation thereof. The latter was as much an agreement on his part as the other. And no good reason can be conceived of why he should not be liable for a failure to comply with that much of his contract. The fact that he may not be made liable on so much of the contract as related to his agreement to sell for want of a price is no good reason for his not being so liable. If this position is correct, then his preventing the valuation did give the Crocker-Wheeler Company a right of action against him, and the declaration stated a good cause of action.

Burdick on Sales, p. 30, says:

"And if the failure of the arbiter to act is due to the fault of either party, he is liable in damages to the other."

And again, on page 88:

"If either party, however wrongfully, prevents a valuation of the goods by the appraiser, he renders himself liable to an action for damages."

Judge Gray held, in his ruling on the demurrer to the declaration, that it stated a good cause of action, and hence overruled the demurrer. So that, even if I had any doubt on this subject, his opinion should be accepted as correct for the purposes of this application. And, though he did not base the cause of action distinctly upon Bullock's agreement to assist in making the valuation, and expressly confine it thereto, I do not think his opinion requires that I should not so base and limit it.

The only other part of the Crocker-Wheeler Company's case is the claim for damages. The amount claimed is the sum of $500,000, which is made up of three separate items as follows, to wit: (1) $40,000 for expenses incurred in performing its part of said contract as to rendering assistance to the appraiser. (2) $300,000 for increased gains and profits and saving in expense in operation of which it was deprived

by Bullock's failure to carry out his agreement in said contract. (3) $160,000 increased gains and profits in addition to the foregoing, which would have resulted from arrangements depending upon the carrying out of the combination and consolidation provided by said contract. This claim presents the question whether, assuming that the Crocker-Wheeler Company will be able to make out a case of liability on the part of said Bullock to it for his failure and refusal to assist in making the valuation, it will be entitled to recover damages on account of either one of these items. Before considering the items separately, two general observations are to be made. In the first place, it would seem that, if there is no liability on account of Bullock's agreement to sell, but only on account of his agreement to assist in making the valuation, the damages which he is liable for are only such as grow out of the breach of the latter agreement, and are not any on account of the former agreement. To allow as damages for the breach of the one what could be recovered only for breach of the other would be to treat the latter agreement as valid and actionable. This excludes, therefore, from plaintiff's right of recovery, the ordinary measure of damages for breach of an agreement to sell personal property, to wit, the difference between the contract price and the market price of the property sold at the time and place of delivery, if it has a market value, and, if not, the difference between such price and its actual value at such time and place. It also excludes therefrom as a measure of recovery the dividends or other income, if any, which have been received from said stock in the Bullock Company since the breach of the agreement to permit and assist in the valuation. Even if there had been a valuation, and then a breach of the agreement to sell, there could have been no recovery on this score. As a matter of fact, however, I do not understand that either item of plaintiff's claim for damages embraces any claim therefor on account of either one of these matters. The first item certainly does not, and the second and third items are limited to the benefits which it is claimed would have accrued to the plaintiff by the putting an end to competition between it and the Bullock Company through the acquisition by it of the entire stock of said company, i. e., by the fact of the combination of the two companies effected thereby.

The other general remark to be made is that it would seem that, assuming that the plaintiff, if it makes out a case of liability on part of defendant, will be entitled to recover damages on account of either item itself, it is not entitled to recover damages on account of all the items together. In other words, it is not entitled to recover damages on account of the expenses incurred in performing its part of the contract, and at the same time damages for the benefits that would have accrued to it by the carrying out of the contract. When it entered into the contract it was willing to expend the first item of its claim in order that it might obtain the second and third items. To give it all would be to give it more than it bargained for when it made the contract.

With these general observations out of the way, it is in order to consider the items separately—at least the first by itself, and the second and third together, they being of the same general nature. So far as the first item is concerned, it would seem that it is a legitimate ground for recovery for a breach of the agreement to assist in the valuation. The

sums sought to be recovered in the other two items are in their essence lost anticipated profits growing out of the mere fact of the combination between the two companies, and thus putting an end to the competition between them. As to the right to recover lost anticipated profits, Judge Sanborn, in the case of Central Trust Co. v. Clark, 92 Fed. 293, 34 C. C. A. 354, has this to say:

> "In the argument and briefs in this case our attention is sharply and repeatedly called to the fact that the damages sought consist entirely of losses of anticipated profits. The mere fact, however, that the damages claimed as a result of the breach of a contract consist of anticipated profits neither establishes the right nor bars the claim to their recovery. Some profits may be and others may not be allowed. The rules which govern their recovery do not differ materially from those which measure the recovery of expenses incurred or other losses sustained through the breach of an agreement."

The question here, then, is to which class of lost anticipated profits this case belongs—those that may or those that may not be allowed. In determining to which class they belong, as well as determining to which class any loss sustained through the breach of an agreement belongs, three things are to be taken into consideration. They are (1) whether the loss sustained was within the contemplation of the parties when the agreement was made as a measure of liability in the event of its breach; (2) whether the breach of the agreement was the proximate cause of the loss; and (3) whether the loss can be made out with reasonable certainty. In order that there may be a recovery for the loss, it is essential that each of these three questions be answered in the affirmative. None of the authorities relied on by plaintiff's counsel hold otherwise. Possibly the first two questions may be answered here in the affirmative. How as to the third or last question: Can it be made out with reasonable certainty that, if the combination contemplated by the contract had been effected, any profits would have been received by the enlarged company due to the fact of the combination, and, if so, their extent, or is this a matter of mere speculation? If it would have received any profits on account of the combination, this could have been only because of increased business, higher prices, or saved expenses due to the combination. Possibly it can be made out with a greater degree of certainty what profits would have been received, and the extent of them because of saved expenses, than because of either of the other two matters; and counsel for the plaintiff in argument lay greater stress upon them. They claim that the combination would have saved expenses to the enlarged company in the following particulars, to wit, in closing out and preventing the establishment of unnecessary branch offices, preventing double advertising and displays at expositions, agents' traveling expenses, engineering, designing, and draughting expenses in originating and building two sets of apparatus to do the same work, administrative expenses, and purchase of new machinery and maintenance of tools in two shops, instead of one, to manufacture exactly the same apparatus. Just what would have been saved on account of all or any one of these several items of expense depended entirely on the judgment of the board of directors and executive committee provided for in the contract, and their judgment as to this would have been affected by at least two considerations. One was that by the contract it was

agreed that both plants should be enlarged and operated; that the name of the Bullock Company should be preserved and attached to all types of apparatus manufactured by it; and that such other plan as might be agreed on by the parties to said contract to secure to the combined company the good will of the Bullock Company and apparatus should be preserved. The other consideration was the increased business that might have grown out of the enlargement of the plants and the fact of the combination. Is it possible, then, that any data can be obtained from which it can logically and legally be inferred what the judgment of the board of directors and executive committee of the enlarged company, affected by these two considerations, would have been? I do not think such data can be obtained. It is well settled in this matter of lost profits that profits which it was anticipated might or would grow out of a new business cannot be recovered, and that because they cannot be made out with reasonable certainty. This is nowhere better put than by Judge Sanborn in the case of Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 49 C. C. A. 244. Here he said:

"Compensation for the legal injury is the measure of recoverable damages. Actual damages only may be secured. Those that are speculative, remote, uncertain may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given, which will form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of damages which resulted from it, before a judgment recovery can be lawfully rendered. These are the fundamental principles of the law of damages. Now, the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount is not susceptible of proof with any reasonable degree of certainty; hence the general rule that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. Howard v. Manufacturing Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U. S. 200, 205, 14 Sup. Ct. 523, 38 L. Ed. 411; Trust Co. v. Clark, 92 Fed. 293, 296, 298, 34 C. C. A. 354, 357, 359; Simmer v. City of St. Paul, 23 Minn. 408, 410; Griffin v. Colver, 16 N. Y. 489, 491, 69 Am. Dec. 718. There is a notable exception to this general rule. It is that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business generally has it in his power to prove the amount of capital he has invested, the market rate of interest thereon, the amount of the monthly and yearly income he derives from it for a long time before and for the time during the interruption of which he complains. The interest upon his capital and the expenses of his business deducted from its income for a few months or years prior to the interruption produce the customary monthly or yearly net profits of the business during that time, and form a rational basis from which the jury may lawfully infer what these profits would have been during the interruption if it had not been inflicted. The interest on the capital and the expenses deducted from the income during the interruption show what the income actually was during that time, and this actual net income, compared with that which the jury infers, from the data to which reference has been made, the net income would have been if there had been no interruption, forms a basis for a reasonably certain estimate of the amount of the profits which the plaintiff has lost. One, however, who would avail himself of this exception of the general rule, must bring his proof

within the reason which warrants the exception. He who is prevented from embarking in a new business can recover no profits, because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced."

It may be said that the business of the two companies involved here was established. That may be true. But the business to be conducted by the two together was not established. It was new, entirely in the future, and it is the profits which would have grown out of this new business, due to the fact of the combination and the shutting out of competition, that is sought to be recovered. Besides, the certainty of the claim for such lost anticipated profits is affected by two other considerations. One is the period of time it covers. Is it for a day, or a week, or a year, or during the life of the corporation, though it may be forever, or is it limited by the accident as to the time when the action was brought or a trial thereof may be had? In the case of Howard v. Manufacturing Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147, recovery of profits of a new business was denied, even though the claim covered a definite period of time, to wit, from the date of the breach of the contract to furnishing the flour mill machinery to the date when it was actually furnished. Possibly this consideration has greater bearing on the question as to whether the lost profits could have reasonably been within the contemplation of the parties when the contract was made. The other consideration is the determination of the plaintiff's proper proportion of such lost profits. The action in New Jersey is brought not by the enlarged Crocker-Wheeler Company contemplated by the contract, to which the entire profits growing out of the combination provided therein would have gone if the combination had been effected. It is brought by the old Crocker-Wheeler Company, one of the constituents in the combination. As it would not have received all the profits growing out of the combination, had it gone through, now that it has fallen through, it cannot recover all of them. It can only recover, if it can recover at all, its proper proportion thereof. This is the proportion it bargained for in the contract, and the proportion it so bargained for was the proportion that the valuation placed upon its stock by the agreed appraiser bore to the sum of the valuation of both stocks by said appraiser. But said appraiser has never made any valuation. Hence its proper proportion of said lost profits—the proportion it bargained for in the contract—is incapable of ascertainment.

Such, then, are the questions involved in the action in which the documents called for are desired to be used as evidence. My consideration thereof has led me to the conclusion that recovery can be had in that action only for breach of Bullock's agreement to assist in the valuation of the stock of the Bullock Company, and the only damages that can be recovered therein are the expenses incurred by the Crocker-Wheeler Company in performing its part of the contract sued on. If this conclusion is correct, the books called for have no relevancy to the basis of recovery or the measure of recovery therein. They will shed no light on either of these matters. The only matter on which it is asserted that they will shed light is the claim to lost profits, and particularly such part thereof as is specifically termed "saved expenses,"

and for which there can be no recovery. And I cannot make out how it is that the books of the Bullock Company, showing the business transacted by it subsequent to the making of the contract, can throw any light on the profits, if any, that would have been caused by or arisen out of the combination. Since that time, as appears from the testimony of Mr. Neave, the capital stock of the Bullock Company has been increased about 500 per cent.—whether by stock dividends or fresh investment of money not appearing—and its business has increased 670 per cent. This increase of business has been due to the management of the Bullock Company in connection with a possible increase in capital invested. The only books of the Bullock Company which it seems to me could possibly shed any light on what profits would have been made by the combination growing out of the fact of the combination are the books showing the business done by the Bullock Company prior to the making of the contract. At any rate, it is only the profits which those books indicated would accrue to the combination on account thereof that could have been within the contemplation of the parties as forming the basis of liability in case the contract was broken. The books called for, then, are not relevant to any right which the Crocker-Wheeler Company had in said action, and their production will be prejudicial to the Bullock Company, as whose agent the witness has possession of them. It is therefore a clear case where the witness has the legal privilege of withholding them. Counsel for witness contends that the books, if produced, will not be admissible in evidence in said action, apart from their relevancy. Of course, if this contention is correct, it is an additional reason for sustaining the privilege. But, inasmuch as I hold that they are not relevant if otherwise admissible, it is not necessary for me to pass on this question.

It is urged by counsel for plaintiff that Bullock at the time of the making of the contract, if not now, was the owner of the entire capital stock of the Bullock Company, so that their interests were identical. Assuming that to have been the case, I see nothing in that consideration to cause a different ruling. The plaintiff has seen fit to make a witness out of an officer of the Bullock Company, and through him as a witness obtain the production in evidence of the books. It cannot make him a witness and deny him the privilege of any other witness. Had the Bullock Company been a party to the contract, instead of Bullock, and the action been brought against it, production of the books could not be enforced under section 724 of the Revised Statutes [U. S. Comp. St. 1901, p. 583]. It is only documents "which contain evidence pertinent to the issue" whose production can be enforced thereunder, and according to the conclusion we have already reached the books in question here are not pertinent to any legal issue in the action in which they are sought to be introduced in evidence.

Nor is plaintiff's position advantaged by the fact alluded to by its counsel that the defendant, Bullock, has pleaded in the action by way of set-off a claim for damages identical with that asserted by the plaintiff. It does not follow from this that the plaintiff's claim for damages is any more meritorious than heretofore determined. The claim on part of Bullock seems to have been put forward for buffer pur-

poses only, and there is no reason to believe that it will be seriously insisted on otherwise.

I am perfectly aware of the delicacy of my position in passing on a question in an action pending in another court, of which this court has no jurisdiction. But I only do so in disposing of a legal privilege asserted by the witness, over whom and his question of privilege this court has jurisdiction, and that court has, and can have, no jurisdiction. The proper disposition of this question of privilege necessitates a determination of said question pending in said action. Hence I cannot shirk it, and must dispose of it in accordance with my convictions. I have but two alternatives before me—to so dispose of that question, or to deny the witness his privilege without a hearing. Between the two there ought to be no question as to which should be chosen. It is true that the question is one in relation to the measure of damages—a question that is usually disposed of at the trial—and that I am disposing of it in advance of the trial upon the disposition of a question as to the introduction of evidence. There is nothing, however, in this why I should not dispose of it. Questions as to measure of damages may, and often are, decided in ruling on the admissibility of evidence. In the case of Globe Ref. Co. v. Landa Cotton Oil Co., 190 U. S. 547, 23 Sup. Ct. 754, 47 L. Ed. 1171, the Supreme Court of the United States sanctioned the practice of passing on the question of measure of damages on a motion to dismiss for want of jurisdiction as to the amount in controversy.

My conclusion, then, is that the production of the books called for would be prejudicial to the company whom the witness represents, and that they are rot relevant to any relief which the Crocker-Wheeler Company can obtain in said action; that, therefore, the witness has a legal privilege to withhold them; and that the application for an attachment should be denied.