H. C. RORICK, *et al.,* v. RECONSTRUCTION FINANCE CORPORATION, *et al.*

(Two Cases—Same Title)
198 So. 494
En Banc
Opinion Filed October 8, 1940
Rehearing Denied November 26, 1940

*Manley P. Caldwell, William Roberts* (of New York City, N. Y.) and *Watson & Pasco & Brown,* for Appellants;

*Evans, Mershon & Sawyer, W. G. Troxler, M. L. Mershon, Elliot Dunwody, Thos. McE. Johnston,* and *Raymond R. Richardson,* for Appellees.

Terrell, C. J.—Reconstruction Finance Corporation instituted this litigation by filing its bill of complaint to foreclose certain State and county tax sale certificates. At the sale ordered by the final decree, the lands described in the certificates brought a surplus of $12,577.81 above the amount of taxes due. The complainant was the purchaser and was adjudged to be entitled to a credit of $33,537.72 on the final decree in addition to the surplus.' The sale was confirmed and the master ordered to deposit the surplus in the registry of the court.

The Board of Commissioners of Everglades Drainage District, the Board of Supervisors of South Florida Conservancy District and various land holders filed petitions asserting liens on portions of the surplus. The chancellor denied all claims except that of Board of Commissioners of Everglades Drainage District and South Florida Conservancy District and decreed that payment of said claims be made in the manner determined by subsequent decree.

At this step in the cause, H. C. Rorick, Joseph R. Grundy, and J. R. Easton filed a class suit praying that they be permitted to intervene as parties to the foreclosure. They also filed a second bill of complaint praying that they be permitted to file a bill in the nature of a bill of review, to reverse the decree of foreclosure for error of law apparent on the record. A motion on the part of Reconstruction Finance Corporation to dismiss both suits was granted.

We are accordingly confronted with two appeals with the same title. The first is from the decree granting the motion to dismiss the petition for intervention being docketed in the lower court as Number L-10-3. The second is from the decree granting the motion to dismiss the bill in the nature of a bill of review and is docketed below as Number L-10-4. The same brief is addressed to both appeals and the questions raised in each are so similar that we treat them together.

The key question presented is whether or not Chapter 7305, Acts of 1917, now Section 1538, Compiled General Laws of 1927, providing that the lien for Everglades Drainage District taxes shall be equal in dignity to the lien for State and County taxes is valid and enforceable.

The chancellor answered this question in the negative and appellees contend that his judgment should be affirmed because Everglades Drainage District taxes are special assessments, that State and county taxes being imposed for the primary purpose of government constitute a superior lien to those imposed for special assessments, that the decisions of this Court have consistently held the lien for State and county taxes to be superior to the lien for special assessments and that to now hold the lien for Everglades Drainage District taxes to be equal in dignity to the lien for State and county taxes would destroy the uniformity required by Section 1, Article IX of the State Constitution.

It is true that this Court has generally held that the lien for State and county taxes is superior in dignity to the lien for special assessments. City of Sanford v. Dial, 104 Fla. 1, 142 So. 233; City of Tampa v. Lee, 112 Fla. 668, 151 So. 316; City of Lake Worth v. McLeod, 112 Fla. 843, 151 So. 318, and others. We find no reason whatever to depart from the holding in these cases but they all involved liens

for street improvement and do not conclude the question raised in this case.

It is also true that Everglades Drainage District taxes are a species of special assessment but for reasons which we shall hereafter demonstrate, it is not of the same class as liens for street paving. The basis for a paving lien and a drainage lien are materially different and the results of the improvement are even more so. This is particularly true as to Everglades Drainage District and it is the lien for taxes of said district that we are concerned with in this opinion. The district is incorporated under separate Act and what we say does not apply to drainage tax liens in general.

The provisions of the Constitution relied on to support the decree appealed from are Sections 1, 2, and 5 of Article IX, and Sections 20 and 21 of Article III. The two sections of Article III last enumerated relate to the subjects about which local laws may be passed but require that all laws affecting the assessment and collection of taxes be of uniform operation throughout the State. Section 2 of Article IX requires the Legislature to provide for raising revenue sufficient to defray the expenses of the State for each fiscal year. Section 5 of Article IX authorizes counties, cities, and towns to impose taxes for city and county purposes on the principles established for State taxation. None of these provisions have anything more than a remote bearing on the question before us.

Section 1 of Article IX requiring the Legislature to "provide for a uniform and equal rate of taxation" is the pertinent provision of the Constitution to construe in answer to the question presented. As a first aid to determine whether or not Section 1538, Compiled General Laws of 1927, impinges on uniformity and equality of taxation, it is

proper to call attention to the fact that these elements (uniformity and equality) apply only to the "rate of taxation." They have no relation whatever to the tax lien or the valuation; in fact, the same section vests in the Legislature power to prescribe rules to secure a "just valuation" of all property for taxation.

State, County, and Municipal taxes are accordingly imposed pursuant to the Constitution or statutes enacted in compliance with the Constitution and while the rate must be uniform, the valuation may be fixed as the Legislature directs. Tax liens and special assessments are controlled exclusively by statute, there being no specification as to them in the Constitution. The status of the lien for State, county, or municipal taxes or for special assessments is one of legislative power and will not be interfered with by the courts unless the requirements of reasonableness, due process, or uniformity are shown to have been destroyed.

To support the contention that Section 1538, Compiled General Laws, violates the requirement as to uniformity the following cases are relied on: State Adjustment Co. v. Winslow, 114 Fla. 609, 154 So. 325; and same title, 117 Fla. 200, 157 So. 507, and State *ex rel.* Maxwell Hunter, Inc., v. O'Quinn, 114 Fla. 222, 145 So. 166. We do not think any of these cases control the case at bar. The O'Quinn case dealt with State and county certificates and had no reference to special assessments. It held that Chapter 16282, Laws of Florida, authorizing the county commissioners to accept compromise settlements on tax sale certificates in counties classified on the basis of population, there being no limitation or standard prescribed, violated the requirement of uniformity in tax collections but it also held that whether or not a classification relating to assessment and collection of taxes embracing less than all the

counties of the State is permissible depends on the nature of the subject regulated and the reasonableness of the classification.

The Winslow case in 114 Fla. dealt with priority of tax liens and is not material to this case. The second Winslow case in 117 Fla. held that a statute making the lien of the city for special assessments equal to the lien of the State, county, and municipality for ad valorem taxes was valid only as to lien for municipal ad valorem taxes. The rationale of this opinion was that to hold otherwise would destroy the uniformity of State taxation guaranteed by the Constitution.

The Constitution does not require that the taxes of all counties and cities be equal and uniform. Uniformity goes only to the rate and since all have their own standards of validation, it necessarily follows that there is no such thing as equality and uniformity between cities and counties in the payment of taxes. Uniformity, equality, and just valuation apply only in the unit taxed. The requirement of uniformity was destroyed in the Winslow case, *supra,* because it raised the municipal lien to a position not enjoyed by other municipal liens and thereby affected the value of the State lien by destroying its uniform value with like liens in other counties. The requirement of uniformity in city taxes, like that of State taxes goes only to the rate of taxation. The legislature has plenary power to regulate the status, priority and manner of enforcing all tax liens including those for special assessments.

It is also contended in this connection that Chapter 6436, Acts of 1913, and other Acts relating to the Everglades Drainage District are local laws and will not be permitted to repeal a general Act on the same subject, that Sections 894 and 896, the former being a part of Chapter 10040,

Acts of 1925, was enacted subsequent to Section 1538, Compiled General Laws of 1927, and is conclusive of the correctness of the decree appealed from.

Sections 894 and 896 have to do with fixing the liens for State and county taxes and make them superior to all others but they express no intention whatever to repeal Section 1538 and the rule is that a special law dealing with a particular subject will repeal all conflicting general laws affecting the same subject matter. The reverse of this is also true, that is to say, a general law will not repeal a special law treating a particular subject in the absence of an express intention to do so and no such intention was expressed here.

We find no reason at this point for a discussion of the question of whether or not legislation pertaining to the Everglades Drainage District is general or special legislation. In Lainhart v. Catts, 73 Fla. 735, 75 So. 47; and Bannerman v. Catts, 80 Fla. 170, 85 So. 336, the validity of the Act creating the district was upheld against constitutional assault. It has been held by this Court to be an agency of the State and the authority it exercises to be exercised for the State. Arundel Corporation v. Griffin, 89 Fla. 128, 103 So. 422. The district is a statutory subdivision of the State embracing a large portion of several counties and if not actually so, it is in nature and treatment a general law.

The general proposition that liens for nonpayment of State and county taxes to support the essential functions of organized government are of higher dignity than liens for the nonpayment of special assessments is not disputed; at the same time, we have found that there is no constitutional inhibition against raising the dignity of a special assessment if uniformity is not destroyed. The test of whether or not

raising the dignity of a special assessment lien to that of a lien for State and county taxes like other constitutional questions will be determined by practical operation and effect.

For clearer exemplification of the question presented by that test, let us approach it from the factual background. The Everglades Drainage District comprises an irregular area in the southern part of the State, 140 miles long, 70 miles wide, containing more than 4,000,000 acres in the midst of which is located Lake Okeechobee, next to Lake Michigan the largest fresh-water lake in the United States. It embraces a portion of nine different counties and is the largest area in the world in a single drainage district.

Before it was transformed by drainage, the Everglades Drainage District was a vast peat-like quagmire covered by water, sawgrass, willow, and custard apple. It was the sanctuary of the alligator, and the bullfrog, the moccasin, and the egret. It was not habitable and had never been penetrated except by an occasional surveying party or by Seminole Indians with the aid of a dugout for trapping purposes. There was some cypress timber on its outskirts but otherwise, it was not timbered and was worthless for agriculture, horticulture, stock raising, or any of the cultural arts. There was hardly a place within its confines except the sand spit around Lake Okeechobee where the Seminole could find dry land enough to pitch his wigwam. It produced nothing of value but alligator hides and bullfrog saddles. It was patented to the State under the Swamp Land Grant Act of 1850 and vast areas of it were in turn patented by the State to railroad companies under legislative land grants as an inducement to railroad construction. It had virtually no market value or value for tax assessment purposes though we find a record of some occasional sales at 25 cents per acre. Prior to drainage the lands along the

outer edge of the district on which there was cypress timber were assessed at 25 cents per acre but those in the interior were not listed on the tax books at any price. In fact, it was during this period that a certain congressman charged that the only way they could be sold was by the quart.

The movement to drain the Everglades was started in 1903, the first drainage tax was imposed in 1905, this was increased in 1907 and in 1913 it was incorporated into a governmental unit by Chapter 6456, Laws of Florida. The plan of drainage contemplates the control of the level of Lake Okeechobee by locks and main canals and a system of lateral canals, to remove surplus rains. To accomplish this purpose, the lake is now connected with tidewater by six main canals from 40 to 250 feet wide, aggregating 450 miles in length and in which are located 19 locks. A levee has been constructed along the south shore of the lake and approximately eighteen million dollars have been spent by the Everglades Drainage District on the project to date. It is still incomplete but considerable areas have been drained and settled. It has been penetrated by three trunk lines of railroad and a system of paved roads, telephones, and telegraph lines. Many towns, schools, churches, and thriving communities have grown up and much of the reclaimed area is in a high state of cultivation. It produces winter vegetables, many staple crops, and sugar cane in abundance. It is also well adapted to poultry raising, stock raising, and dairying. In March of the current year, the writer visited the 25,000-acre sugar plantation of the United States Sugar Corporation on reclaimed lands in the Everglades near Clewiston. One unit of this project was a cane mill costing more than one million dollars and operating at capacity, although on a trip across the Everglades twenty years ago, in company with F. C. Elliott, Chief Drainage Engineer, we

traversed the lands embraced in this plantation in a row-boat. The reclaimed lands are now assessed for ad valorem · taxes at values unheard; of before drainage; they have a market value of from five to three hundred dollars per acre, and are actually selling at the latter prices.

At the time drainage was commenced, there was not a white family living in the Everglades. It now has a population of many thousands and is growing rapidly. In an area that large, many perplexing problems have arisen. The Board having the administration of the project in hand has established an experiment station in the heart of the district for soil and crop experimentation. The plan of drainage is far from completion but as that advances, the question of settlement becomes a pressing one and so others might be named but it is not essential.

The object of this factual review is for the clearer demonstration of the differential in assessment and market value that drainage has produced. In other words, prior to drainage, the Everglades had nothing more than a potential value. Drainage gave it an intrinsic value that it never had before and would not have now except for that factor. Abandon drainage and it will be only a matter of time when the canals will fill and the district revert to its primeval state. Such is not the case with a city block or a paved road across the country. In them, there must be an intrinsic value to warrant the improvement and support the assessment. Otherwise it will not be made.

From this, it follows that the very basis for ad valorem taxes for State and County purposes in the Everglades is dependent on drainage. Drainage brought it into being and through drainage it is preserved. If it requires drainage to evolve a potentiality into a tangible asset and to keep it and that asset is a taxable value that would not otherwise

be present, certainly in equity and good faith the lien for drainage taxes should be equal to the lien for State and county taxes. This holding involves a classification for tax purposes less than all the counties of the State but in the O'Quinn case, *supra,* we held that this could be done if the nature of the subject and the reasonableness of the classification warranted. From what the factual background herein detailed reveals, the classification was reasonable and warranted. It brings a taxable potentiality into a reality and in doing so, it is not shown that uniformity in rate is destroyed or that it bears more heavily in one part of the district than it does in another. To hold otherwise would eventually destroy the State and county assessment. To uphold it retains the predicate for both assessments; uniformity and equality is the rule of the district and it is not destroyed as to assessments outside the district if they are in any way involved.

The second and only other question we are called on to answer relates to the right of appellants to intervene in the suit to foreclose the tax certificates. It is not charged that the Board of Commissioners of Everglades Drainage District are acting illegally or in fraud of creditors and furthermore it appears that this phase of the suit was left open for further decree. Since we have settled the status of tax liens, we will assume that the Circuit Court of Palm Beach County will proceed to distribute the surplus properly on the petition before them.

The judgments appealed from are reversed.

Reversed.

WHITFIELD, BUFORD, CHAPMAN and THOMAS, J. J., concur.

BROWN, J., dissents.