TITUS et al. v. RORICK et al.

No. 10502.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1948.

Robert J. Pleus, of Orlando, Fla., and R. O. Holloway, of Toledo, Ohio (Holloway, Peppers & Romanoff, of Toledo, Ohio, and Robert J. Pleus, of Orlando, Fla., on the brief), for appellants.

Robert C. Dunn, of Toledo, Ohio (Fraser, Shumaker, Kendrick & Winn, of Toledo, Ohio, on the brief; Robert C. Dunn and Charles R. Brown, both of Toledo, Ohio, of counsel), for appellees.

Before HICKS, ALLEN and MILLER, Circuit Judges.

HICKS, Circuit Judge.

Appellants in 1941 were the owners of some $219,000.00 par value bonds of the Everglades Drainage District of Florida for which, following a default on January 1, 1931, in the payment of interest and matured bonds, appellees H. C. Rorick (now deceased but here represented by the Executors of his estate) and James R. Easton and Joseph R. Grundy (never before

the court) served as a Protective Committee under a Deposit Agreement dated January 2, 1931, and The Spitzer-Rorick Trust and Savings Bank served as Depositary.

On June 6, 1941, the Protective Committee (herein called the Committee) entered into an agreement with a Syndicate for the sale of the bonds for 50% of their principal plus certain interest. Appellants, under the terms of the Deposit Agreement (herein called the Agreement), within thirty days of notice of the contract to sell, notified the Committee of their election to withdraw from the Agreement and demanded the return of their bonds. The Committee levied an assessment of $35.00 per bond, aggregating some $7,600.00, upon the withdrawing bondholders for its expenses which appellants paid, but the Committee delayed the return of the bonds because appellants declined to give it a release.

On November 1, 1943, appellants brought suit. They filed a complaint containing six different claims in which they sought to require the Committee to deliver the bonds, and in which they asked for damages for their unlawful detention. A seventh claim prayed for an accounting of the receipts and disbursements of the Committee and for a decree refunding to appellants any amounts determined to be excessive or paid out in violation of the terms of the Agreement. Appellees answered that they would deliver the bonds if appellants would accept them as a full release and discharge of appellees. Appellees averred that by the terms of the Agreement the assessment was within the uncontrolled discretion of the Committee and that appellants were not entitled to an accounting and that in any event there could be no accounting until the purposes of the Agreement were accomplished.

A cross-complaint sought a decree for attorney's fees, additional compensation to the Committee and for costs.

On April 28, 1944, the court ordered appellees to deliver the bonds to appellants within thirty days, and delivery was made. The court further ordered appellees to accompany delivery "with an itemized accounting of receipts, expenditures and disbursements, including fees for personal services received by each and a statement of all liabilities as prayed for in plaintiffs' seventh cause of action."

On October 20, 1944, a Special Master was appointed and he filed his report on August 7, 1946. The Master made a detailed review of the evidence and made findings of fact which are, in brief: That appellants joined in the Agreement, Article III, Sec. 3 of which provided, that upon withdrawal of bonds the Committee might in its "uncontrolled discretion" fix the pro rata share of the withdrawing depositor of the expenses of the Committee to date; that the Committee, under Article VI, Sec. 2, might employ such depositary, counsel, attorneys, agents or employees as in its opinion should be necessary, useful or convenient and should be entitled to "repayment of all advances and reimbursement for all expenditures and indemnity against all liabilities incurred by the Committee hereunder"; that the Committee under Article VI, Sec. 3, was authorized in its discretion to incur liabilities in an attempt to obtain financial results for the bondholders and was empowered to discharge liabilities of others incurred in the accomplishment of such results; that under Article VI, Sec. 6, a Committee member was liable for no acts of omission of the Depositary or other agents nor for any error of judgment or mistake of law or default of another member but only for "his own wilful misconduct"; that upon delivery by the Committee to the depositors of their bonds and coupons and acceptance by them, its members "shall be fully released and discharged from any and all responsibilities and liabilities of the Depositors" and that the members of the Committee should be entitled to "reasonable compensation" for their services and those of the Secretary and other agents and employees, and that a provision for such compensation was recommended in the first circular letter mailed by the Committee to the bondholders in January 1931; that the members and officers of the Committee served the depositing bondholders "including the plaintiffs" for ten and one-half years "with fidelity, zeal, courage and ability, and established and protected the rights of the bondholders, after unprecedented, difficult, expensive, protracted and almost continuous litigation,

against the combined efforts and opposition of Florida state and local officials, and large, influential and politically powerful landowners in the Everglades Drainage District"; that appellees have furnished an itemized, complete and accurate accounting showing receipts and expenditures, including fees for personal services and liabilities as of July 1, 1941, the date of withdrawal by appellants; that appellants' pro rata share of expenses as of that date was $35.00 per $1,000.00 bond; that Committee actions taken under the Deposit Agreement were in good faith and for the best interests of all depositing bondholders and resulted in substantial benefits to them; that the Committee members were guilty of no wilful misconduct but that on the contrary their conduct was scrupulous and conscientious; that in view of all the circumstances the compensation of the Committee and of its attorneys and agents, employees and Depositary was "reasonable," and that there was only "speculative" evidence that any other action on the part of the Committee would have achieved more beneficial results.

The Master concluded that appellants had not sustained their claim (1) that the assessment of $35.00 per bond was excessive, unlawful or violative of the terms of the Agreement; or (2) that the expenses of the Committee were excessive and exorbitant and violative of the terms of the Agreement. He concluded further that appellees were not guilty of misconduct and had not acted in bad faith; that the $35.00 assessment was binding upon appellants; and that under the terms of the Agreement appellees were justified in withholding the bonds pending instructions of the court and that appellants were not entitled to damages for any delay in their return. He denied additional compensation to appellees under the counterclaim.

On October 28, 1946, the court entered an order confirming the Report of the Master and adopting his findings of fact and conclusions of law. It dismissed the complaint as well as the counterclaim.

Appellees did not appeal.

The issues raised come down to three: (1) whether appellants obtained full and complete accounting; (2) whether they were entitled to a refund by reason of fraud, the payment of exorbitant fees and lack of accomplishment by the Committee; and (3) whether they were entitled to damages for the protracted retention of their bonds by the Committee after receipt by it of appellants' notice of withdrawal.

The interesting story of the reclamation of the Everglades Drainage District of Florida is covered by this very large record.

The defaulted bonds were for the most part issued in 1917 or issued or refunded in the following decade, to finance drainage operations in a specified district of the Everglades swamp. The issue totalled over eleven million dollars and some nine million were outstanding at the time of the default. All bonds were sold to Spitzer-Rorick & Company, an investment banking house of Toledo, Ohio, specializing in municipal bonds, of which appellee, H. C. Rorick, was President, and appellee Easton was a member. Some of the 500,000 acres in the District were privately owned and some state owned, and held in the name of the Trustees of the Internal Improvement Fund. By statute taxes were levied on the private lands to pay interest and amortization charges on the bonds and the Trustees paid from funds derived from the sale of state lands, etc. The bonds were issued by the Board of Commissioners of Everglades Drainage District and the drainage work was conducted under its supervision. The Trustees and the Board in part were composed of certain state officials, including the Governor.

In 1927 the Governor proposed to issue twenty million dollars worth of additional bonds without levying additional taxes. Spitzer-Rorick & Company took the lead in successfully enjoining this issue upon the ground that it would impair the value of the outstanding bonds.

In November 1930 the Board threatened default on bonds and interest due on January 1st following; and appellee, H. C. Rorick, was invited to meet, along with certain distributors and large bondholders, in New York on November 25th, with certain Florida officials to consider the formation of an Everglades Bondholders Committee with whom the Board might deal. The upshot of this meeting was the forma-

tion of the Committee, with H. C. Rorick as Chairman, Walter H. Lippincott, who upon his death was succeeded by Joseph R. Grundy, and appellee Easton, as members. William Roberts of New York and W. H. Watson of Pensacola were named general and local counsel respectively. Both had been active in the successful litigation of 1927.

Whereupon, the Agreement was drafted and by its terms bondholders became parties thereto by depositing their bonds with the Depositary. By July 1931 holders of over five million dollars of bonds had deposited past-due coupons or bonds and at the time of the sale ten years later holders of well over eight million dollars in bonds had deposited their bonds and participated in the sale.

At the outset it appeared to the Committee that the Board was not repudiating the bonds but was only asking an extension of three years in which to pay interest; but following a meeting held in Florida on February 2, 1931, between Committee members and representatives, and authorized representatives of the Drainage District, the Committee reported that it was apparent that no further cash payments would be made on the bonds or coupons unless the federal courts compelled such payments.

There ensued a prolonged series of law suits. Some were between the Committee and state officials; some between unfriendly bondholders and state officials; some in federal courts, including the Supreme Court; and some in the state courts, including the Supreme Court of Florida. In some the Committee was a party and in some it appeared by its counsel as amicus curiæ or as representing friendly litigants. These suits were on matured bonds or coupons; or sought to impound money to satisfy judgments on bonds or coupons; or to enforce action by state officials; or to restrain action deemed violative of bondholders' rights; or to invalidate legislation which the Committee considered violative of the rights of the bondholders. In one suit, as here, an attack was made on the activities of the Committee by dissident bondholders. Litigation proceeded until the date of the sale and H. C. Rorick testified that the rights of bondholders were so thoroughly established by "decisions of the Supreme Court of Florida and the Federal Court, early in 1941, that this finally forced settlement."

During the course of the litigation the Committee repeatedly sought a settlement. It hoped to collect the face of the bonds with perhaps some forgiveness of interest, or, to bring about a refund, and it encouraged bondholders to that end because under the Agreement no settlement for less than the face value of the bonds could be made by the Committee without ratification by the bondholders. Until 1934 the Trustees refused to pay taxes on state owned lands in the District and this encouraged private landowners to do likewise. H. C. Rorick testified that this situation was akin to a "tax strike." This condition was aggravated by state legislation which made a portion of the tax, designed for the payment of bonds and interest, applicable to the payment of administrative expenses of the District. Other legislation reduced the tax levies to a point insufficient to pay the coupons on the outstanding bonds. There was other legislation adverse to the interests of bondholders which we need not discuss in detail. The substance of these legislative acts is outlined in Rorick v. Com'rs, 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242. The most harmful features of these Acts from the standpoint of the bondholders and the Committee were successfully challenged in the first phase of the so-called "General Equity suit." Rorick v. Board of Com'rs of Everglades Drainage Dist., D.C., 57 F.2d 1048, a three-judge case decided April 13, 1932.

In 1934–5 Florida had a new Governor and a new Board and numerous conferences were held by the Committee and these officials who exhibited a disposition to cooperate. We can only touch the high spots in this maze of activity, but certain suspended tax levies were restored to the rolls by the Florida Supreme Court. By agreement, Board moneys in the hands of the State Treasurer were assigned by the Board to the Committee, which in turn allocated some moneys to the Board for administrative purposes. During this period the Committee was vouchsafed some participation in the activities of the Board in

matters affecting the bonds. The Committee had up to now been financing its own way by borrowing. Out of the money thus assigned to it, it retained a quarter of a million dollars for expenses and for the payment of a dividend of $10.00 upon $7,-109,000.00 of bonds which it then represented. The new set-up proved disappointing. Collections were much below expectations and the Board complained that it did not derive enough revenue from a special one mill levy even to prepare an assessment roll, and that unless expenses were advanced to it there could be no levy for 1936. However, the Committee in late 1936 made a second payment of $10.00 per bond out of eked-out collections, and it used this occasion to urge non-depositing bondholders to come into the Agreement.

In 1936 one Lawler, a non-depositing bondholder, brought suit to reach moneys in the hands of the State Treasurer for the payment of his own past-due coupons and bonds. The Committee was not a party to this troublesome suit but was of substantial aid in its successful defense. During the progress of this litigation the Committee filed twenty mandamus suits to reach funds of the District immediately upon their receipt by the Treasurer lest the Supreme Court of Florida apply the "first come, first serve" rule of that state. Although the Supreme Court held that this rule did not apply to these bonds, the Board nevertheless later stipulated with Lawler that he might be paid and that a permanent writ might issue from the Supreme Court. Upon the understanding that the payments to Lawler were made out of funds previously assigned to it, the Committee brought suits to recover the value of the payments.

In 1937 the legislature passed further adverse legislation. Acts 1937, c. 17902, F.S.A. c. 298 App. §§ 1530(6), 1530(8), 1530(9), 1530(53) to 1530(55), 1530(104) et seq. It reduced the levy of acreage taxes by two-thirds and diverted a portion of the remainder to administrative uses. This bill was attacked by a supplemental bill to the general equity suit.

In that same year the Board conducted negotiations with the RFC for a loan to pay the bonds, but the Committee refused to submit the proposition to the bondholders because it appeared that the loan would net them only thirty cents on the dollar for principal and interest. In 1938 a settlement through an RFC loan was again considered and the Committee agreed to recommend a fifty percent adjustment. An alternative, refunding plan, the Committee thought it unwise to recommend until the 1937 Act was construed. The Committee reported that the sentiment for a refunding plan came from stockholders who had purchased bonds at low valuations for speculation and not from those who had purchased prior to default. The RFC rejected the proposal for a loan with which to make this fifty percent settlement.

One of the Committee reports told of proposals to by-pass the Committee and deal with the bondholders individually. H. C. Rorick testified that this would destroy the bargaining position of the Committee. In the Committee reports the bondholders were told that the strength of the Committee was in the number of bondholders they represented and more bondholders were constantly urged to deposit their bonds.

In 1938 two suits were filed, one in Florida and the other in Ohio, wherein an attempt was made to oust the Committee and have the Agreement terminated, on the ground that it was originally to endure for three years with power of extension to six years and it had been illegally extended beyond the latter period. The Florida suit failed for lack of service of process, but the Ohio suit was vigorously prosecuted and in the course of taking H. C. Rorick's deposition he was imprisoned, at the instance of the notary, because he would not produce a complete list of the Committee's depositors with their holdings and addresses, but he was released upon a writ of habeas corpus. The Ohio Court of Appeals dismissed the suit [Bechtel v. Rorick, et al., 65 Ohio App. 455, 30 N.E.2d 451] and the Supreme Court declined to review the case. The effect was to validate the procedure by which the Agreement was extended and by which the depositors were notified of the extensions; and that it would be considered binding if they did not elect to withdraw within thirty days. Neither appellants nor

any other depositors had elected to withdraw.

In 1939 the Board proposed to pay thirty-eight cents on the face of each bond if it could obtain a loan of thirty cents from the RFC, but this loan involved many conditions unacceptable to the Committee, such as a requirement that the bonds be deposited with a Jacksonville bank and that new bonds be validated by the Supreme Court of Florida. The Committee however submitted the proposition to the bondholders and only 10% voted to accept it.

In its report for September 5, 1939, the Committee made the observation that interest in a settlement on the part of the Board and landowners usually coincided with court decrees in favor of the Committee and that the Committee and its counsel had determined to proceed vigorously to enforce bondholders' rights until a settlement or refunding agreement was "actually consummated."

A second suit, supplemental to the general equity suit, was filed on July 19, 1937. A second three-judge court was assembled which dismissed the suit upon the ground that under Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, Florida law was applicable. The Supreme Court [Rorick v. Com'rs, supra, 307 U.S. 208, 59 S.Ct. 809] observed,—"This litigation, which has extended over eight years, is but one phase of a complicated controversy pursued in both state and federal courts." It summarized the relief sought as an attempt "to enjoin the defendants distributively, and with much particularity, from effectuating the various modifications made by the Acts of 1929, 1931 and 1937 concerning the rates of taxes, the disposition of their proceeds, the procedure in cases of tax delinquency, the authorization of bond issues and the internal relations between the District and the Trustees as all these were claimed to be originally defined by the Act of 1913." The Supreme Court ordered the three-judge decree vacated and remanded the case for hearing before a single district judge. The Judge granted the Committee a temporary injunction and the Court of Appeals affirmed on June 21, 1940 [Cone v. Rorick, '5 Cir., 112 F.2d 894] and remanded the case for "deliberate examination" on the application for a permanent injunction. The case was yet pending while negotiations were entered into which resulted in the sale of June 6, 1941.

We have given a somewhat extended history of the general equity suit with its different phases because it compresses into understandable compass many difficulties confronted by the Committee.

Two decisions of the Supreme Court of Florida further strengthened the hand of the Committee. In the case of an application for a mandamus, the Supreme Court [see State v. Board of Com'rs of Everglades Dr. Dist., 139 Fla. 559, 190 So. 712] issued a peremptory writ directing the Board to make out tax lists and deliver them to the County Tax Assessors for the full amount of the Everglades taxes on each appraisal of land in the District under the 1925 Act, F.S.A. c. 298 App. §§ 1530, 1534, 1553, for the years 1933–39 inclusive, which had the effect of placing a lien of $13,500,000.00 against the tracts. The second decision was that of Rorick v. RFC, et al., 144 Fla. 539, 198 So. 494, reversing a lower court decision and holding valid the Act of 1917, F.S.A. c. 298 App. §§ 1538, 1539, 1541, 1547, 1554, which provided that the lien for Everglades taxes was of equal dignity with that for state and county taxes. The Master considered this decision of "very great importance" because it advised the Board and the landowners in the District, including the Trustees, that a levy of over $15,000,000.00 including the 1940 levy, was a first lien on the lands prior to all others except state and county taxes with which it had equal validity.

In June 1940 the Committee on behalf of its own bondholders and all others, brought suit against certain large taxpayers to foreclose the lien for Everglades taxes on their lands.

These suits brought about at least two conferences between the Committee and all opposing interests, which we shall not detail because they accomplished no concrete results.

A new Governor was inaugurated on January 7, 1941, and the Committee wrote

him, calling attention to the fact that in 1923 the then Governor categorically stated to Spitzer-Rorick & Company that Florida was obligated to pay taxes on all the delinquent lands and reminding him of the agreement of the Trustees to prevent default on the bonds by taking up and paying for sufficient tax certificates to meet maturing bonds and coupons, but that since January 1, 1931, the Trustees had not only not taken up the certificates, but had not paid taxes on 858,000 acres of Government Grant lands to which they had title.

This brought on a conference between the Governor, the Attorney General and the Committee and other interested parties, from which came an intimation that the state had a buyer for the bonds. The Committee sought and received authorization of its bondholders to make a cash sale of the bonds with unpaid coupons at $500.00 per bond plus interest at 4% from January 1, 1938. A settlement with a Syndicate was consummated on these terms and a payment of $4,588,364.37 was made and the Committee promised to distribute $520.00 per bond immediately upon the receipt by the Depositary of the certificates of deposit with final distribution as soon as expenses and liabilities of the Committee could be ascertained and deducted. By the terms of the Agreement the Committee had reserved the right to repurchase some 15% of the bonds sold in the case of depositors who might elect to withdraw from the Agreement.

Appellants so elected. The Committee made a levy of $35.00 per bond, as hereinbefore indicated, and withheld delivery of appellants' bonds until they should give a release. The bonds were delivered and the case proceeded upon the accounting ordered by the court and for damages for unlawful detention of the bonds.

The appellees' attempted compliance with this order for an accounting was their Exhibit 24, which contained an itemized statement of receipts of the Committee from January 1, 1931 to July 1, 1941, and of its disbursements for the same period and an extended statement of expenses and liabilities as of July 1, 1941, plus certain exhibits, and all this was supported by hundreds of pages of testimony by H. C. Rorick, Easton and others. None of the appellants testified. The receipts totalled $422,808.93 and were derived from payments of the Board of $358,903.57, to which we have heretofore referred, plus loans from members of the Committee and the Depositary. The disbursements totalling $419,695.15 consisted of 573 separate items, leaving a balance on hand as of that date of $3,113.78.

Major liabilities totalling $341,130.34 included repayment of a loan of $30,000.00 plus interest to the Depositary; a balance of $50,000.00 to general counsel Roberts, in addition to $25,000.00 paid him; a balance of $25,000.00 to Florida counsel Watson, in addition to $15,000.00 paid him; about $40,-000.00 to various other counsel in the wide ramification of law suits; $40,000.00 for services of the Depositary; $22,050.00 to Marvin Rorick, Secretary, figured at $2,-100.00 per year; a balance of $75,000.00 to Chairman Rorick in addition to $25,-000.00 paid, and a balance of $18,000.00 to Committee member Easton, $7,200.00 having been paid, his services having been figured at $2,400.00 per year, including the services of his personal secretary.

In Exhibit 52 the appellees pointed out that liabilities on the $8,073,000.00 of bonds deposited prior to the sale approximated $41.68 per bond. The report showed an unexpended balance in the distribution account for the two $10.00 dividends of $33,-540.00, which was shown as a disbursement in Exhibit 24, since the Committee held it in reserve for possible payments on further deposits of bonds. Actually, the Committee paid out only $11,140.00 upon bonds deposited shortly after the sale, leaving $22,400.00 in the reserve fund for distribution potentially available for expenses. Hence the Committee felt justified in fixing the assessment at $35.00 per bond instead of the $41.68 for which it was actually liable.

█ Under Rule 52 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, we may not set aside a Master's findings of fact where adopted by the court unless "clearly erroneous." We have made an exhaustive examination of this

record, consisting of seven large volumes, and we cannot say that the findings are "clearly erroneous."

■ Appellants' major premise is "that there had been a complete bungling of the affairs of the trust resulting in nothing of value being accomplished for the beneficiaries." We do not share this view. We think that the persistent and tenacious efforts of the Commitee, and especially of its Chairman, H. C. Rorick, in the face of bewildering obstacles and united opposition of state officials and landowners laid the groundwork for the sale. From the beginning Rorick recognized the necessity of uniting the bondholders and holding them together. There was evidence that but for his discernment and intelligent opposition the lists of bondholders would have been disclosed and that they would have very likely been knocked off one by one in individual settlements, which would have been disastrous to the bargaining position of those remaining. There was testimony that at one time bonds could be bought for as low as eight cents on the open market and that they were never as high as the actual sale price. See Kelly et al. v. Everglades Dr. Dist., 5 Cir., 132 F.2d 742. The courts took judicial notice that during a great part of the ten and a half years involved, the country, and especially Florida, was passing through a financial depression of catastrophic proportions. But the Committee's faith in the bonds was so deep-seated that for four and one-half of these years, it financed its own activities by borrowing sometimes from its own members without a single pledgable asset. Appellants argue that all the Committee accomplished in ten and a half years was the collection of but $20.00 per bond, that the sale to the Syndicate was not a settlement but only an over-the-counter sale, the implication being that the money came to the Committee without effort on its part.

We do not so interpret the record nor the events of the first six months of 1941. When the Governor was elected Rorick got in touch with him. The general equity suit was coming on for final hearing. The Governor asked that it be postponed as a condition for negotiating. Rorick at first refused but yielded when it appeared that there was a chance of settlement. Rorick admits that he was disappointed in the settlement but he recommended it to the depositors because he thought that even if court decision favored the Committee, no court order could compel taxpayers to pay their taxes, even though the assessments were ample to service the bonds, and the taxes were levied. The settlement came when, after ten and a half years, the united front of the bondholders had not been broken. It seems clear enough that a better settlement could not have been forced; and the circumstances of the sale by appellants of their bonds for $75,000.00 more than they would have gotten in the Committee sale is indicative of very little. Appellant, H. W. Kelly, was a party plaintiff to the suits of Kelly, et al. v. Everglades Drainage District, 5 Cir., 127 F.2d 808 and 5 Cir., 132 F.2d 742, supra. For brevity we refer to these cases without discussing them.

■ We cannot say that the fees paid were clearly unreasonable. H. C. Rorick's services are reflected in the unrelenting pressure by litigation and otherwise which he kept up on the Florida authorities. He was legally trained and was a man of resourcefulness, courage and determination. He was thoroughly familiar with the Everglades problem from the beginning and had had wide experience in the municipal bond field. He had great earning power and for the ten and a half years he devoted the major portion of his time to the work of the Committee. He made numerous trips to Florida, New York and elsewhere on Committee work, carried on a voluminous correspondence and prepared the full and illuminating reports of the Committee whereby the bondholders were held together.

■■ Easton grew up in the business, was a partner and officer in the Spitzer-Rorick Company and had a technical familiarity with the Everglades dating from 1913. He made an extended study of laws relating to bonds with especial relation to the Everglades and in 1917 he assisted the Attorney General of Florida in drafting amendments to legislation. He spent one-

third of his time on Committee matters and attended "every meeting with the Drainage District Commissioners and landowners". We think that the allowances to him were reasonable enough. Marvin H. Rorick, son of H. C. Rorick, was Secretary-Treasurer of the Committee and was trained in municipal banking business and understood the problems of the District and spent a third of his time upon the work. We cannot say that the Master erred in his findings as to Marvin Rorick.

■ There was conflicting evidence as to the reasonableness of the charge made by the Depositary; but there was immense detail in handling the bonds and coupons of more than 1,000 bondholders and it is apparent that the records were in excellent shape at the time of the sale. The Master chose to disregard testimony that the charges were excessive in the face of testimony that they were the usual charges around Toledo and we cannot say that he was in error. We hardly regard it necessary to speak of the work of Roberts and Watson. The numerous reported cases, federal and state, in which they carried the major load speak for themselves. The Master discussed these cases at length,— one was prosecuted to the Supreme Court of the United States and several to the Supreme Court of Florida. There were several district court cases, more than one of which went to the circuit court of appeals. Roberts, senior member of a large New York firm, testified that the work was so demanding that the allowance of $75,-000.00 would barely cover his office overhead for the Everglades work; that the reasonable value of his services, including overhead, was $150,000.00; that if he had been paid at a comparable rate for his other work he would have had to close his office. We think that neither Roberts' nor Watson's charges were unreasonable, and the same is true of allowances made to other counsel.

Appellants severely criticize the record of the litigation and assert that all that was needed was to require taxes to be levied and reduce all items to judgment as they fell due. We think that this formula constitutes an over-simplification of the problems. The Committee and its counsel were not dealing with a static condition but with resourceful men who felt that they had the power of a great state behind them. We agree with the Master that there was only "speculative" evidence that, had the Committee "proceeded in some other way to enforce payment of the bonds, it would have been successful at the time in obtaining a larger net amount for the bonds. * * *" It is significant that about 98% of the bondholders approved the sale.

■ We think that the $35.00 per thousand assessment was reasonable. There was evidence, also speculative, that lower charges had been made in allegedly similar situations in Florida, but our difficulty is that these situations had fundamental dissimilarities which justified the Master in disregarding them.

■ Several of appellants' objections seem to ignore the terms of the Deposit Agreement. Agreements, such as here involved, with very similar terms, are neither new nor unusual. Industrial & General Trust, Ltd. v. Tod, et al., 1905, 180 N.Y. 217, 73 N.E. 7; Bullard v. Cisco, 1933, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141; see also Bogert on Trusts and Trustees, Vol. 5, § 1089. It is not unusual to vest a trustee with wide discretion in the conduct of the affairs of the trust. Restatement of the Law of Trusts, Vol. I, Sec. 187; see also North Adams Natl. Bank, Tr. v. Curtiss, 278 Mass. 471, 180 N.E. 217, 83 A.L.R. 607. And a trustee by contract may absolve himself of the consequences of his conduct except for bad faith, dishonesty and the like. Industrial & General Trust, Ltd. v. Tod, supra; Williston on Contracts, Rev. Ed. Vol. I, Sec. 312, note 9, and Vol. 6, Sec. 1751E; Lidgerwood v. Hale & Kilburn Corp., D.C., 47 F.2d 318; Packard v. Kingman, 109 Mich. 497, 67 N.W. 551; Restatement of the Law of Trusts, Vol. I, Sec. 187E; see also Hazard v. Durant, C.C., 25 F. 26; Brown v. Smith, 2 Cir., 73 F.2d 524.

Woods, Court Trustee v. City Natl. Bank & Tr. Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820, relied upon by appellants as

holding that there must be a strict liability of the trustee, is primarily concerned with the power of the district court in proceedings under Chapter X of the Chandler Act, 11 U.S.C.A. § 501 et seq., to disallow claims for compensation. In that case the facts disclose a duality and conflict of interest on the part of the trustee which is not present here.

Appellants gave notice of their desire to withdraw when the announcement of the sale was received. Such a situation was controlled by Article III, Sec. 3 of the Agreement. We quote:

"Any Depositor within thirty days after the date of mailing such notice * * * may withdraw from this agreement, upon surrender to the Depositary of his Certificate of Deposit and upon paying to the Depositary for the Committee, *such amount as the Committee in its uncontrolled discretion may fix as his pro rata share of the expenses* * * * to the date of such withdrawal and at the election of the Committee, such amount as the Committee *in its discretion may fix as his pro rata share of the liabilities of the Committee.* And thereupon, such withdrawing Depositors shall be entitled to the delivery of the bonds. * * * *Depositors so withdrawing shall,* upon such withdrawal and without further action, *be fully relieved from the obligations of this agreement and cease to have any rights thereunder."* (Italics ours.)

Appellants had stuck with the Committee until the sale and from that time the Committee's work largely involved settling up. In its uncontrolled discretion, which was subject to review only for wilful misconduct and breach of good faith, the Committee fixed the withdrawal payment of $35.00 per one thousand, the same amount paid by the depositors who stayed in.

▆▆▆▆ Appellants complain of the failure of the Master to require the production of original records of the Secretary and the Depositary, the Minutes of the Committee, correspondence between Committee members and between the Committee and counsel. They complain that appellees were not required to produce a single original record of the Depositary, and they protest that hearsay evidence was allowed as to the contents of such record. Many of these records were ostensibly sought, to ascertain whether the Committee and those affiliated with it had used their position to trade in bonds to their own advantage. The matters sought to be proven were not so much the contents of the records but whether appellees had traded in the bonds (a thing they had a right to do under the Agreement). If such an inquiry was pertinent at all, Rorick testified categorically that neither he nor the Depositary had so traded. Easton so testified for himself, and further, that so far as he knew, all bonds owned by the bank, partnership, and individual members were deposited with the Committee and were assessed the $35.00. The Master saw and heard these witnesses and it was within his discretion to supplement or discredit their testimony by reference to the records of the Depositary. We think that his discretion was not abused. The records of the Depositary no doubt revealed the personal financial relationship between it and at least one thousand other bondholders to whom appellees owed a duty of trust and confidence. Under such circumstances neither the Master nor the court was compelled to expose the records unless the ends of justice required it. Sinclair Ref. Co. v. Jenkins Pet. Proc. Co., 289 U.S. 689, 53 S.Ct. 736, 77 L.Ed. 1449, 88 A.L.R. 496; Carpenter v. Winn, 221 U.S. 533, 542, 31 S.Ct. 683, 55 L.Ed. 842; see also Crocker-Wheeler Co. v. Bullock, 134 F. 241, Cir. Court for the Southern District of Ohio.

In an equity case, relied upon by appellants, it was held that the right to inspect must necessarily be left "in the first instance to the sound discretion of a trial judge." Union Trust Co. v. Superior Court, 11 Cal.2d 449, 464, 81 P.2d 150, 158, 118 A.L.R. 259. The demand for the production of the records would have come with greater force if appellants, or at least some of them, had testified or were present during the progress of the trial, and it should be noted that when appellees offered to permit a certified public accountant to inspect the records under the supervision of the Master, appellants did not avail themselves

of the tender. See on this point Wigmore on Evidence, 3d ed., Vol. VIII, Sec. 2212.

▮ It is complained that no books of record whatsoever were kept of receipts, disbursements or the application of the proceeds of the collections in the form of a ledger, cash books, journal, etc. This complaint comes to this,—that someone else might have kept the records differently. The Master found,—"Defendants have furnished to the plaintiffs as ordered by the court and filed in this proceeding, an itemized, complete and accurate accounting, showing all receipts and expenditures, including fees for personal services received by each, and a statement of all unpaid liabilities, as of July 1, 1941 * * * together with vouchers evidencing the disbursements." We think that this finding was sustained by the evidence.

Other allegations of fraud are in our opinion so devoid of merit that they do not warrant attention here.

We come now to the final question, whether appellants are entitled to damages for the retention of their bonds by appellees after notice of appellants' withdrawal. As we have indicated, the complaint was for damages for unlawful and malicious detention of the bonds. However, in appellants' brief they argue for damages for *conversion* due to the sale to the Syndicate before notice was received of the withdrawal, and for malicious refusal to return the bonds after the Committee had recovered them from the Syndicate. The Master concluded:

"5. Under the facts and the terms of the Deposit Agreement, the defendants were justified in withholding the return of the bonds and coupons held by the plaintiffs and deposited with the Committee pending the instructions of the court with reference thereto, and the plaintiffs are not entitled to recover any damages by reason of any delay in such return."

▮ It does not appear that the question of conversion was ever presented to the Master or the court. The only question properly before us for review on this phase is, whether the Committee, recognizing appellants' right to their bonds, unlawfully retained them when appellants refused to give a release. Although the claim is for damages, the issue involves considerations of equity. The Committee represented a host of bondholders other than these few who had withdrawn. It was ready to settle with appellants but they, in demanding the identical bonds which they had deposited, thereby putting the Committee to inordinate trouble in regaining them when other bonds would have sufficed, put the Committee upon notice that it might have more trouble. In this situation the Committee could hardly settle with other bondholders until it had reached a settlement with appellants. Construing the Agreement as providing for a release when a depositor withdrew, the Committee requested one from the appellants as a condition of the return of the bonds. This request was refused and the Committee, in view of its responsibilities, decided to have the matter of its liability to withdrawing depositors determined by the court. The Master and the court denied any damages for the delay and we concur.

The decree of the District Court is affirmed.